UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JOSHUA M. STEWART, | ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) | No.: 3:21-CV-193-RLJ-DCP |
| GRADY PERRY, | ) ) ) | |
| Respondent. | ) | |

# MEMORANDUM OPINION

Petitioner Joshua M. Stewart, a prisoner in the custody of the Tennessee Department of Correction, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the legality of his confinement under Knox County judgments of conviction for aggravated sexual battery and rape of a child, for which he received an effective sentence of thirty-three years imprisonment. Having considered the submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court finds that no evidentiary hearing is warranted, and the petition should be denied.[1]

## I. SUMMARY OF RELEVANT EVIDENCE AND PROCEDURAL HISTORY

The Tennessee Court of Criminal Appeals ("TCCA") provided the following summary of evidence presented at Petitioner's trial:

> In this case, the Defendant was indicted for rape of a child and two counts of aggravated sexual battery. The victim was ages seven and eight at the time of the incidents and was the Defendant's stepsister.

---

[1] An evidentiary hearing is only appropriate in a § 2254 action where review of the record demonstrates that a petitioner might be entitled to relief if given an opportunity to prove the factual allegations raised in the petition. *See* Rules Governing Section 2254 Cases in United States District Courts ("§ 2254 Rules"), Rule 8(a); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

The victim testified that her birthday was December 12, 2000, that she was age fifteen at the time of the trial, and that she was in the tenth grade. She said that she had lived with her father since eighth grade, that she had lived with her best friend's family for about six months before moving into her father's home, and that she had lived with her mother before living with her best friend's family.

The victim testified that between second and fourth grade, she lived with her mother, her stepfather, her younger brother, and the Defendant in a two-bedroom apartment. The victim said that she shared a bedroom with her younger brother and that the Defendant slept in the living room. She said that the Defendant was her "big brother" and that she looked up to him. She recalled the Defendant's babysitting her and her younger brother frequently and said that she talked to the Defendant about her problems and that she saw the Defendant as her protector. She said that the Defendant was age twenty-four or twenty-five during this time. She said that as she became older, she wanted to spend less time with the Defendant.

The victim testified that she was in court "[t]o prosecute [the Defendant] for making me touch him, touching me, and fingering me." She said this happened in the two-bedroom apartment and recalled she was in second grade at the time. She stated that one incident occurred at night after she had gone to bed. She said that she hated going to bed because she knew the Defendant would enter her bedroom. She said that the Defendant entered the room, that she attempted to act as though she were asleep, and that the Defendant "took [her] arm," "made [her] touch his penis" until he ejaculated on her hand, cleaned her hand with what she believed was a paper towel, and left the room. She recalled this incident "vividly" and said that the Defendant pulled the blanket away, grabbed her left arm, and did not speak. She said that her younger brother slept in the bedroom during the incident. She said that the Defendant did not hurt her when he grabbed her arm but that she was scared to pull away or to refuse him. She said that this incident was not the first time she had touched the Defendant's penis and said she knew it was a penis because "it was just one of those things that you could tell .... It was weird." She said the Defendant made her rub his penis by placing his hand around her hand and moving her hand up and down. She recalled hearing the zipper and button of the Defendant's pants before and after the incident and said it was warm outside. She said that the Defendant told her if she told anyone, they would never see each other again. She thought she was in the third grade at the time.

The victim testified that more than one incident occurred in the apartment, although she did not recall the events "vividly." She recalled one incident in which she awoke during the night, walked to her mother's bedroom, and asked her mother to come into her bedroom because she was scared of the dark. The victim said that her mother would not get out of bed, that the Defendant was awake in the living room watching pornography, and that she asked him if she could watch a Barbie movie. She said the Defendant replied, "Yeah, after you watch my movie." She recalled that she watched the Defendant's movie, that a woman performed a sex act on a man, and that the Defendant told her if she were ever sick, she should come to him

2

because "the white stuff would make [her] feel better." She said that the Defendant wanted her to "taste it," that she refused, and that the Defendant left her alone.

The victim testified that generally, the Defendant told her not to open her eyes each time he entered her bedroom and that the Defendant said frequently that "it was just a game and ... he would play [her] game if [she] played his" game. She said she and the Defendant played board games and hide and seek. She said that generally, the Defendant usually told her she was "a good girl" after each incident before leaving her bedroom. She said that she was "surprised" the first few times the Defendant entered her bedroom at the apartment but that after a while, she "kind of got use[d] to it ... and ... anticipated it." When asked if she recalled anything about the Defendant's body, she said he "had a lot of tattoos."

The victim testified that about one month before her family moved out of the apartment and to a home on Jacksboro Pike, the Defendant moved into a home with his then-wife in Knoxville. The victim recalled visiting the Defendant's home frequently and said she was best friends with the Defendant's daughter. She described the layout of the Defendant's home and said that when she was about age nine and in the fourth grade, she slept in the Defendant's daughter's room or in the living room. She recalled one incident in the Defendant's daughter's bedroom during which the Defendant "made" her touch his penis with her hand. The victim said that the Defendant's daughter slept in the bedroom during the incident. The victim recalled lying on her back in the Defendant's daughter's bed and the Defendant's telling her to be quiet. She did not recall whether her eyes were closed. She said that she rubbed his penis, that he ejaculated, that he cleaned her hand, and that he left the bedroom. The victim said that she told the Defendant's daughter about the incidents and that the Defendant's daughter did not believe her.

The victim testified that a second incident occurred at the Defendant's home. She recalled that she fell asleep on the couch in the living room, that she faced the wall while lying on the couch, and that the Defendant came to the couch and "made" her touch his penis. She said that he took her hand and placed it on his penis, that he closed his hand around her hand, and that she rubbed his penis until he ejaculated. She did not see anyone else in the room but recalled that the television was on. The victim stated that generally, the Defendant forced her to touch him every time she stayed overnight at his home.

The victim testified that when she lived in the home on Jacksboro Pike with her mother and her stepfather, she did not share a bedroom. She recalled sleeping in the master bedroom and having a couch and a fireplace inside her bedroom. She said that the Defendant visited the home on the weekends, that sometimes he came alone, and that sometimes he came with his family. She said she was age eight or nine at this time. She recalled "a few times" when the Defendant touched her vagina "over [her] clothes" and said it felt "weird." She said that this was not the same incident in which the Defendant inserted his finger into her vagina. She said that another incident occurred at night when everyone else was asleep, that she awoke

3

and went to the living room, and that the Defendant "came in there" and watched television with her. She said that the Defendant placed his hands "through [her] clothes," that he touched her vagina inside her underwear, and that he placed his finger inside her vagina. She did not recall what television program was airing but said that she "was leaned up against him" on the couch and that they were "kind of half laying [sic] down, kind of propped up type of state." She said that afterward, the Defendant told her not to tell anyone. She said all of the incidents at the Jacksboro home occurred on the living room couch.

The victim testified that incidents also occurred inside her Jacksboro Pike bedroom at night after she had gone to bed. She recalled one incident in which she awoke when the television at the end of her bed moved and saw the Defendant standing at her bed. She said that the Defendant told her to close her eyes, that he took her hand, and that he "made" her rub his penis until he ejaculated. She did not recall the Defendant's clothes but knew nobody else was in the bedroom. She said another incident occurred in her bedroom but did not recall when it occurred. She said the last time it occurred, she was in the fifth grade and age nine or ten. She said that she turned age ten in December of her fifth-grade year.

The victim testified that she did not report the incidents because she and the Defendant's daughter were best friends, and she feared the Defendant's daughter would hate her. The victim also said she did not report the incidents because the manner in which the Defendant told her not to tell anyone about the incidents scared her. The victim said she did not think her mother would believe her. The victim said that she, ultimately, told the Defendant's daughter and the Defendant's son simultaneously and that she told her friend at school when they were in the sixth grade. The victim said she also told her mother when she was in the sixth grade.

The victim testified that she went to "Child Help" and that she discussed the incidents with a woman, and that she did not disclose everything because she did not "fully remember everything." She said that the incidents occurred between second and fifth grade and that although she did not recall the number of times she touched the Defendant's penis, she knew it was "a lot." She said the Defendant inserted his finger into her vagina once but touched her over her clothes more than once.

Knoxville Police Investigator Keith Johnson testified that he began investigating this case in January 2014, after he received a Department of Children Services' referral. He contacted the victim's father and scheduled a meeting for the victim at Child Help for a forensic interview. Investigator Johnson said he interviewed the Defendant on March 27, 2014. An audio recording of the interview was played for the jury.

In the recording, the Defendant spoke to Investigators Johnson and Cook. The Defendant was provided a waiver of rights form and told he could end the interview at any time. He read and signed the form. One investigator asked if the Defendant's

4

wrist tattoo was of a skull, and the Defendant confirmed he had tattoos of a skull and a razor blade. The other investigator told the Defendant that he wanted to obtain a "history" from the Defendant and asked for the Defendant's father's name. The Defendant identified his father and said he did not know if his father was married because he "had not talked" to his father. The Defendant said that his father was married to the victim's mother "as far as [the Defendant] knew." The Defendant identified his wife and five children. The investigators and the Defendant discussed the origins of the Defendant's children's names. The Defendant identified the victim's mother's and his father's children, including the victim.

The Defendant requested to know why the investigators were talking to him, and one investigator stated that the investigator wanted to know when the Defendant stayed with the Defendant's father and the victim's mother when the couple lived in the two-bedroom apartment, approximately three or four years before the interview. The Defendant said, "I stayed with my Dad ... [when the victim] was staying with her father and [the victim's mother] was in a treatment facility." The Defendant said that he stayed at the apartment for a couple of weeks when the victim was there. The Defendant stated that he "stayed a few nights" at another home.

Investigator Johnson testified that no forensic evidence was obtained because the incidents occurred three to five years before the victim's disclosure. He said that his records showed the Defendant's birthday was July 8, 1982.

On cross-examination, Investigator Johnson testified that he did not interview the victim, her father, her mother, her stepfather, or her friend, whom the victim testified she told about the incidents. Investigator Johnson said that he did not examine Facebook or the victim's cell phone.

*State v. Stewart*, No. E2017-00864-CCA-R3-CD, 2018 WL 287178, at *1-4 (Tenn. Crim. App. Jan. 4, 2018), *perm. app. denied* (Tenn. Mar. 14, 2018) ("*Stewart I*").

Petitioner was convicted as charged and sentenced to an effective sentence of imprisonment of thirty-three years in TDOC custody [Doc. 8-1 p. 90-92]. The TCCA affirmed Petitioner's conviction and sentence on direct appeal. *Stewart I*, 2018 WL 287178, at *9. The Tennessee Supreme Court subsequently denied discretionary review [Doc. 8-13].

Petitioner then filed a petition for post-conviction relief that was denied following an evidentiary hearing [Doc. 8-14 p. 4-22, 28-35]. The TCCA summarized the evidence presented at Petitioner's post-conviction evidentiary hearing as follows:

5

At the November 7, 2019 evidentiary hearing, the petitioner testified that he met with trial counsel "[h]alf a dozen" times before the trial and that they discussed potential witnesses. The petitioner said that he told counsel that his daughter, Loxzanna Stewart, "was there with me at multiple occasions that these things were supposed to have been happening." He claimed that Ms. Stewart often slept in the same bed with the victim and that she was a "[l]ight sleeper." The petitioner added that Ms. Stewart could have testified that the victim was "known to make up stories."

During cross-examination, the petitioner testified that Ms. Stewart would have been 12 years old at the time of his trial and that his "wife's cousin Tony had custody of her at the time." He said that when he mentioned Ms. Stewart as a potential witness, trial counsel "stated that she was underage and that, you know, we would see."

The petitioner's 17-year-old daughter, Loxzanna Stewart, testified that the victim was Ms. Stewart's "grandfather's stepdaughter, and I lived in their house for a number of years." She said that she was "about seven or so" at the time of the alleged offenses and that the victim was "about a year older than me." Ms. Stewart said that she was "not completely aware" of the victim's reputation for truthfulness "because we were children" but that "I would believe that she did make things up." Ms. Stewart clarified that she had never been around when the victim made things up, but she added that the victim "did say that she had like imaginary friends or just normal children things." She said that, during the relevant time period, she and the victim shared a queen-sized bed and that she "was a light sleeper, yes." Ms. Stewart testified that she thought she would have awoken had the defendant entered the bedroom and assaulted the victim.

During cross-examination, Ms. Stewart testified that she was 15 years old at the time of the petitioner's trial and that she was living with an aunt at that time. She said that when they were both younger, the victim would make up stories and that she had an imaginary friend, but she agreed that the victim's behavior was typical for a child of that age. Ms. Stewart insisted that the defendant could not have entered the bedroom she sometimes shared with the victim without waking Ms. Stewart because "I believe that I am a light sleeper."

Trial counsel testified that he represented the petitioner for approximately one year before the trial and that he had conducted four or five jury trials in serious felony cases before being appointed to the petitioner's case. Counsel said that he retained the services of an investigator to help him locate witnesses. He recalled that in the petitioner's case, some of the witnesses were minors "that we could not get access to." He added that although he "was open to talking to anybody that showed up" on the day of trial, "as a matter of strategy, I hesitate to put anybody on the stand that I don't know what they're gonna say." Counsel said that his investigator "was turned away" when he tried to contact Ms. Stewart and that "none of [the petitioner's] family was cooperative with ... his defense."

6

> During cross-examination, trial counsel reiterated that neither he nor his investigator interviewed Ms. Stewart prior to trial because "[t]he family was not cooperative with us." He acknowledged that he did not subpoena Ms. Stewart, saying, "I would have never served her with a subpoena to testify without knowing what she would say."
>
> At the conclusion of the hearing, the post-conviction court took the petition under advisement. In its written order denying post-conviction relief, the post-conviction court accredited trial counsel's testimony "that the petitioner's family were not cooperative during the investigation" and that the family's refusal to cooperate "could have certainly prevented the attorney and investigator for the petitioner from interviewing Ms. Stewart." The court deemed trial counsel's decision not to call Ms. Stewart as a witness at trial "a reasonable strategic decision" given that Ms. Stewart's family prevented his interviewing her prior to trial. The post-conviction court found that Ms. Stewart's testimony was not "convincing," noting specifically that Ms. Stewart "offered no admissible testimony regarding the character for truthfulness of the victim" and that "[h]er testimony about being a light sleeper would not have added much to the proof already elicited."

*Stewart v. State*, No. E2020-00150-CCA-R3-PC, 2021 WL 100102, at *1-2 (Tenn. Crim. App. Jan. 11, 2021) ("*Stewart II*"). The TCCA affirmed the judgment of the post-conviction court [Doc. 8-18]. Petitioner did not seek further discretionary review.

Petitioner timely filed his federal habeas petition on or about May 24, 2021, alleging that he received the ineffective assistance of counsel at trial[2] [Docs. 1 and 2]. Specifically, Petitioner alleges counsel performed ineffectively in failing to (as paraphrased by the Court):

Claim 1(a): Investigate and call Loxzanna Stewart as a witness during trial.
Claim 1(b): Adequately impeach the victim at trial.
Claim 1(c): Adequately investigate the existence of Kalay Morris prior to trial.
Claim 1(d): Locate and interview Amy Tennant and Tiara Evens prior to trial.

---

[2] In a memorandum in support of his petition, Petitioner also purports to raise a claim that "Petitioner's guilty plea was entered involuntarily, unknowingly[,] and unintelligently in violation of the Due Process Clause of the Fourteenth Amendment [Doc. 2 p. 2]. However, Petitioner pleaded not guilty and was tried by a jury [*See, e.g.*, Doc. 1 p. 2; Doc. 8-1 p. 71]. Therefore, the Court presumes this claim was alleged in error. Moreover, Petitioner does not present any facts or argument in support of any such claim in the memorandum [Doc. 2], and the claim is not mentioned at all in the petition itself [Doc. 1]. Accordingly, the Court finds Petitioner has failed to properly raise this issue and will not address it further. *See* § 2254 Rules, Rule 2(c) (requiring petition to specify all grounds for relief and facts supporting each ground).

[Doc. 2 p. 11-14]. After an initial review, the Court ordered Respondent to file a response to the petition along with the State-court record [Doc. 7]. Respondent subsequently filed the State-court record and an answer to the petition [*See* Docs. 8, 10, 12]. Petitioner did not file a reply to Respondent's answer, and the deadline to do so has expired [*See* Doc. 7]. This matter is ripe for review.

## II. LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a State court unless that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro*, 550 U.S. at 473.

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *Williams,* 529 U.S. at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable − a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. Thus, a petitioner is entitled to relief on a federal claim decided on its merits in

8

Case 3:21-cv-00193-RLJ-DCP   Document 13   Filed 11/05/21   Page 8 of 16   PageID #: 739

State court only where he demonstrates that the State ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When evaluating the evidence presented in State court, a federal habeas court presumes the correctness of the State-court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by the requirement of exhaustion and the doctrine of procedural default. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Coleman v. Thompson*, 501 U.S. 722, 731-32, 735 n.1 (1991). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available State remedies, and the State court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a State court clearly and expressly bases its dismissal of a claim on a State procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman*, 501 U.S. at 731-32, 735 n.1; *Gray*, 518 U.S. at 161-62; *see also Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013).

The exhaustion requirement, codified at 28 U.S.C. §2254(b)(1), requires a petitioner to "fairly present," each federal claim to all levels of the state appellate system, meaning he presented the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). In Tennessee, presentation of a federal claim to the TCCA is sufficient to deem the claim exhausted under State law. *See* Tenn. S. Ct. R. 39 (establishing presentation of claim to TCCA is sufficient to exhaust

9

state remedies); *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (recognizing Tennessee's rule removing Tennessee Supreme Court as "antecedent for habeas purposes").

Additionally, Tennessee petitioners may generally proceed only through one full round of the post-conviction process, and there is a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule). Therefore, if a petitioner fails to present a claim in a first petition filed within the applicable deadline period, the petitioner is typically prevented from returning to State court to litigate any additional constitutional claims. In such circumstances, the claim is considered technically exhausted but procedurally defaulted. *Gray*, 518 U.S. at 161-62; *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted.")

A procedural default may be circumvented, allowing federal habeas review of the claim, where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749-750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules, or that trial counsel rendered ineffective assistance. *Coleman*, 501 U.S. at 753-54. The prejudice demonstrated to overcome the default must be actual, that is, the error must have "worked to [Petitioner's] *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). A fundamental miscarriage of justice of occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Such a claim requires a "petitioner to support his allegations of constitutional error with new reliable evidence – whether

it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). In this context, actual innocence "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

While the ineffective assistance of trial counsel can serve as "cause" for a defaulted claim, errors of post-conviction counsel cannot generally serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 752-53. An equitable exception to this rule was established in *Martinez v. Ryan*, which held that the inadequate assistance of post-conviction counsel or the absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). The Supreme Court has described the *Martinez* exception as containing the following requirements:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez*, 566 U.S. at 13-14, 16-17). Other attorney errors, including errors of appellate counsel and errors on post-conviction appeal, do not allow a petitioner to assert *Martinez* as an exception to the doctrine of procedural default. *Davila v. Davis*, 137 S. Ct. 2058, 2062-63 (2017); *Martinez*, 566 U.S. at 16.

In determining whether an ineffective assistance of trial counsel claim is substantial, the Court asks whether it "has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). Conversely, "a

claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15-16).

### III. ANALYSIS

Petitioner claims that he received ineffective assistance of counsel. Such claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a habeas petitioner to satisfy a two-prong test to warrant federal habeas corpus relief: (1) he must demonstrate constitutionally deficient performance by counsel, and (2) he must demonstrate actual prejudice as a result of such ineffective assistance. *Strickland*, 466 U.S. at 687. Conclusory allegations of wrongdoing by counsel "are insufficient to state a constitutional claim." *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) (citing *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998)). Rather, deficiency is established only when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" the Sixth Amendment guarantees. *Strickland*, 466 U.S. at 687-88. A reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id.* at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id.*

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id.* at 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id.* at 691.

### A. Failure to Investigate and Call Loxzanna Stewart as a Witness

Petitioner claims that trial counsel was ineffective for failing to "locate, interview, and call as a witness at trial, [his] daughter, Loxzanna Stewart" [Doc. 2 p. 12-13]. Specifically, Petitioner alleges Ms. Stewart could have testified that (1) the victim had the reputation of being a liar who frequently fabricated stories, and (2) Ms. Stewart was in bed with the victim on several of the relevant dates and would have been awakened if Petitioner had actually committed the assaults as alleged [*Id.*].

Petitioner presented this claim during his post-conviction proceedings [Doc. 8-14 p. 28-35]. In rejecting this claim on post-conviction appeal, the TCCA found:

> In our view, the record supports the denial of post-conviction relief. Trial counsel's accredited testimony established that he attempted to interview Ms. Stewart prior to trial but that her family's refusal to cooperate thwarted his efforts. Because trial counsel was not permitted to interview Ms. Stewart prior to trial, his decision not to present Ms. Stewart as a witness at trial was a reasonable strategic decision. Moreover, we agree with the post-conviction court that nothing in Ms. Stewart's testimony at the evidentiary hearing was particularly impactful. Certainly, her testimony was not of the caliber that would suggest that the result of the proceeding would have been different had she testified at trial.

*Stewart II*, 2021 WL 100102, at *3.

Because this claim was adjudicated on its merits, the question for this Court "is not whether a federal court believes the State court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citation and internal quotation marks omitted). "Because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

The record does not support Petitioner's claim that counsel was ineffective for failing to call Loxzanna Stewart as a witness at trial. First, the record supports a finding that trial counsel's

13

efforts to interview the witness were stymied by Petitioner's family members [*See, e.g.*, Doc. 8-15 p. 51]. As a result, trial counsel made a reasonable strategic decision not to subpoena a possibly unfavorable witness whose testimony could not be anticipated [*Id.* at 61]. Second, trial counsel testified that he had a strategy for attacking the victim's credibility on cross-examination — i.e., that her allegations were fabricated and factually mirrored those of a television show that the victim watched [*Id.* at 53-54]. That strategy was reasonable, and its execution did not depend on Ms. Stewart's testimony. Finally, the post-conviction trial court made a factual finding that Ms. Stewart's testimony was not material to the defense, as she was unable to "offer testimony sufficient to allow her to testify at trial as to the victim's character for truthfulness." *Stewart II*, 2021 WL 100102 at *3 [*See* Doc. 8-14 p. 33-34; Doc. 8-15 p. 32-35]. Thus, Ms. Stewart's testimony would not have aided defense in its efforts to portray the victim as untruthful.

Given trial counsel's overall strategy, it is not unreasonable to reject Petitioner's challenge to trial counsel's failure to compel Ms. Stewart's testimony. *See Strickland*, 466 U.S. at 690 (finding "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Accordingly, the rejection of this claim was not contrary to, nor did it involve an unreasonable application of, *Strickland* and its progeny, nor was it based on an unreasonable determination of facts in light of the evidence presented.

### B. Remaining Claims

Petitioner also claims that trial counsel rendered ineffective assistance in failing to: (1) adequately impeach the victim at trial; (2) adequately investigate the existence of Kalay Morris prior to trial; and (3) locate and interview Amy Tennant and Tiara Evens prior to trial [Doc. 2 p. 20-22]. These were among the claims raised by Petitioner during his initial post-conviction proceedings [Doc. 8-14 p. 13-23]. Following the denial of his post-conviction petition, however,

Petitioner abandoned these claims and only appealed his claim that trial counsel performed ineffectively for failing to call Loxzanna Stewart as a witness at trial [Doc. 8-16].

Because Petitioner did not present these ineffective assistance claims to the TCCA on appeal, the claims are now technically exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion[.]"); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule).

As previously noted, the ineffective assistance of post-conviction counsel may constitute "cause" for the default under the holding of *Martinez*. However, *Martinez* is inapplicable where, as here, a claim was raised in initial post-conviction proceedings but abandoned on appeal. *See, e.g., West v. Carpenter*, 790 F.3d 693, 698-99 (6th Cir. 2013) ("[A]ttorney error at state post-conviction appellate proceedings cannot excuse procedural default under the *Martinez-Trevino* framework.").

Regardless, the Court finds that Petitioner cannot establish that his ineffective assistance claims are substantial. Counsel did attempt to impeach the victim at trial, and any allegations that Kalay Morris, Amy Tennant, or Tiara Evans could have provided relevant, material testimony are purely speculative allegations that will not support a claim of ineffective assistance of counsel. *See, e.g., Wogenstahl*, 668 F.3d 307 at 335.

Therefore, the Court finds that Petitioner has failed to establish cause for these defaults or resulting prejudice, or that failure to consider the claims would result in a miscarriage of justice. Accordingly, the Court is prohibited from considering the merits of these claims.

## IV. CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue

15

unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

V. **CONCLUSION**

For the reasons set forth above, the instant petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

ENTER:

                                                                               s/ Leon Jordan
                                                   United States District Judge